

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| HDM:JPL/JV/JKW | *271 Cadman Plaza East* |
| F. #2020R00002 | *Brooklyn, New York 11201* |

December 6, 2023

<u>By E-mail and ECF</u>

The Honorable William F. Kuntz
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:  United States v. Dela Saidazim
        <u>Criminal Docket No. 21-564 (S-2) (WFK)</u>

Dear Judge Kuntz:

  The government respectfully submits this letter in advance of the defendant Dela Saidazim's (the "defendant" or "Saidazim") sentencing, which is scheduled for Wednesday, December 13, 2023, at 1:00 p.m. On February 16, 2023, the defendant pleaded guilty to the sole count in the above-captioned superseding information charging her with conspiracy to defraud the United States government in violation of 18 U.S.C. § 371. <u>See</u> ECF Dkt. No. 153. For the reasons set forth below, the government respectfully requests that the Court impose a custodial sentence within the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 46 to 57 months' imprisonment.

I.  <u>Background</u>

  A.  <u>Factual Background</u>

  As detailed in the Presentence Investigation Report ("PSR"), beginning in or about October 2018, Saidazim and her co-conspirators, including David Bishoff, Brycen Millett, Hafizullah Ebady, Brian Michael Sutton, Anthony Santamaria, Joshua Manuel Alegria and Hershel Tsikman (collectively, the "Defendants"), engaged in a scheme to fraudulently bill private

health care benefit programs ("Private Insurers") for fraudulent telemedicine prescriptions.[1]  See PSR ¶ 11.

Saidazim used multiple phones, encrypted messaging platforms and aliases, including "Gina Payne" and "Eloise Pay," to conceal her criminal activity.  See id. ¶ 6.  She initially recruited licensed physicians to purportedly review prescriptions by telemedicine providers.  Id.  She later became the personal assistant to one of the leaders of the scheme, Brian Sutton, who was indicted in November 2023.  Id.; see Third Superseding Indictment, ECF Dkt. No. 241.  In that role, she communicated the directions of the scheme leaders to others in connection with the purchase and operation of pharmacies controlled by the Defendants.  PSR ¶ 6.

      i.    Overview of the Fraudulent Scheme

First, Saidazim's co-conspirators Bishoff and Millett used call centers to contact beneficiaries enrolled with Private Insurers and offer medications at no cost to the beneficiaries and without any medical exams to determine the medical necessity for those medications.[2]  PSR ¶ 11.  Regardless of whether or not the beneficiaries agreed to receive these medications, the Defendants generated fraudulent prescriptions for the medications for these beneficiaries.  Id.  Next, Sutton, Bishoff and Millett directed Saidazim and others to recruit and hire licensed physicians.  Saidazim and others told the doctors that they would be reviewing prescriptions written by other mid-level practitioners for the beneficiaries after telemedicine visits.  Id.  In actuality, there were no telemedicine visits and no mid-level practitioners who were recommending or prescribing the telemedicine prescriptions.  Id.  Instead, the Defendants used the licensed physician's National Provider Identifier (NPI) numbers to issue the fraudulent prescriptions, identifying the physicians as the prescribers.  Id.

In most cases, the beneficiaries did not receive the prescribed medications.  PSR ¶ 12.  Nevertheless, the Defendants and their co-conspirators submitted reimbursement claims for these medications to the Private Insurers in the name of pharmacies under their control.  Id.  The Defendants fraudulently acquired and controlled the brick-and-mortar pharmacies with pre-existing pharmacy board registrations and insurance relationships with the Private Insurers (the "Scheme Pharmacies").  Id.  The Defendants used straw buyers to purchase the Scheme Pharmacies to conceal their ownership and control.  Id.  On behalf of the Defendants, Saidazim coordinated multiple aspects of the purchases through the straw buyers.  After buying and assuming control of the Scheme Pharmacies, the Defendants directed teams of "billers" located in Moscow and using remote billing software to submit hundreds of thousands of reimbursement requests for the fraudulent prescriptions to the Private Insurers using the prior pharmacy owners' names and registrations, or the names of straw owners.  See Third Superseding Indictment ¶¶ 10,

---

[1] Sutton, Santamaria, Alegria and Tsikman were charged in the above-captioned case in November 2023, i.e., after Saidazim pleaded guilty and after the preparation of the PSR.  ECF Dkt. No. 241.

[2] The call centers were initially located in the Utah, Bishoff and Millett's home state, before the Defendants moved the operations overseas, including ultimately to Moscow.  Third Superseding Indictment ¶¶ 10-11.

2

16, 21, 23. The Private Insurers paid millions of dollars in fraudulent reimbursements to the Scheme Pharmacies before flagging the aberrant spike in billing, commencing audit investigations and discovering the fraud. Id. ¶¶ 23, 25.

Once the Private Insurers realized the Scheme Pharmacies were seeking reimbursement for fraudulent prescriptions, the Private Insurers ended their relationship with the Scheme Pharmacies, after which the Scheme Pharmacies ceased to operate and were closed. Id. ¶ 23; PSR ¶ 13. The Defendants, in turn, would continue the criminal conspiracy through new Scheme Pharmacies. As a result of the fraudulent scheme, Private Insurers paid over $280 million in reimbursements for fraudulent prescriptions. Third Superseding Indictment ¶ 25.

ii. Saidazim's Recruitment of Doctors

Beginning in or about January 2019, Saidazim was hired to recruit doctors on behalf of the scheme. Def. Mem. at 12. As the defense concedes, "Dela called doctors after they responded to advertisements posted by the company on bona fide recruiting websites, such as Ziprecruiter.com, followed her scripts, and, if she found an interested doctor, would pass that doctor's information along to others at the company." Id. As one example, in 2019, the Defendants posted an online job announcement for a physician on behalf of the TeleCare Group. PSR ¶ 17. An individual who was a physician licensed in New York, New Jersey and other states, responded to the job posting and was contacted by a woman who identified herself as "Gina Payne," later revealed to be Saidazim. Id. Saidazim told the physician that she was a recruiter for the TeleCare Group and that the TeleCare Group was seeking to hire physicians to review consultation sheets and approve medications suggested by other physicians. Id. This physician worked for the TeleCare Group between approximately October 2019 and December 2019. Id. During this time, the TeleCare Group emailed various documents to the physician, including consultation sheets and medication recommendations, which the physician reviewed and approved by email. PSR ¶ 18. Initially, Saidazim was the physician's point of contact for the TeleCare Group, until the role was transferred to a different co-conspirator. Id.

Throughout her employment, Saidazim recruited multiple physicians for the scheme, including physicians in Michigan. PSR ¶ 19.

iii. Saidazim's Role as a Personal Assistant

After approximately three months working for the conspiracy, Saidazim was promoted to Sutton's personal assistant. Def. Mem. at 12. In that role, Saidazim was a hub of communications and operations between the Defendants and others. At the direction of the other co-conspirators, Saidazim coordinated multiple aspects of the scheme, including:

(1) recruiting doctors;
(2) recruiting straw buyers to purchase Scheme Pharmacies;
(3) incorporating shell companies with the straw buyers as the nominal owners and officers;
(4) opening bank accounts in the shell companies' and straw buyers' names;
(5) closing on the purchase of Scheme Pharmacies, including sending agents to the physical closings;

3

  (6) transferring funds to purchase Scheme Pharmacies;
  (7) installing remote billing software at Scheme Pharmacies;
  (8) staffing and operations for Scheme Pharmacies;
  (9) tracking and depositing payments by Private Insurers;
  (10) tracking and responding to Private Insurer inquiries, investigations and audits; and
  (11) closing Scheme Pharmacies.

PSR ¶¶ 22-23.

   iv. Saidazim Was Aware of the Criminal Conduct and Victim Losses

  In her role as Sutton's assistant, Saidazim was a clearing point for communications concerning all aspect of the scheme and was aware of the operation of dozens of Scheme Pharmacies. PSR ¶ 22. Among communications she received, tracked and escalated to the attention of Sutton and the other Defendants, Saidazim was forwarded audit letters from Private Insurers concerning at least six Scheme Pharmacies. PSR ¶ 23. Those audit letters identified shortfalls in the purported amounts of prescriptions disbursed and the pharmacies' inventories. Id. In other words, the Private Insurers determined that the pharmacies could not have actually disbursed the billed for prescriptions because they lacked sufficient inventories. Id. The audit letters also discussed how beneficiaries had advised that they had never requested or received the billed for medications. Id. In the audit letters forwarded to Saidazim alone, the Private Insurers identified $27,242,706.78 in losses. Id. To be clear, these losses are based solely on a limited universe of audit letters found on Saidazim's devices and email accounts, and therefore foreseeable to Saidazim.

  As Sutton's personal assistant at the hub of the scheme, Saidazim was aware of the criminal aspects of the conspiracy and the potential consequences. Saidazim and her co-conspirators joked about the consequences of their criminal activity. For example, on May 24, 2019, Millett wrote to Saidazim: "Ya there's no way out of this now. 5 years in the feds." On June 29, 2019, Millett wrote: "Either way – 25-life is the same hahah. . . Put money on my books." Saidazim responded, in relevant part: "I got you!! Make sure you have that extra care package every month."

  B. Procedural History

  On June 7, 2021, the defendant was charged by complaint with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349.

  On June 9, 2021, the defendant was arrested and the Honorable Taryn A. Merkl entered an order of detention with leave to apply for bail at a later date. See ECF Dkt. No. 9. Fourteen days later, on June 23, with the government's consent to a proposed bail package, the defendant was released to home detention. See ECF Dkt. No. 18.

  On November 8, 2021, a grand jury sitting in the Eastern District of New York returned an indictment charging the defendant with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, and substantive health care fraud, in violation of 18 U.S.C. § 1347.

See ECF Dkt. No. 29. On August 5, 2022, a grand jury sitting in this district returned a superseding indictment against Saidazim, which added two defendants. See ECF Dkt. No. 92.

On February 16, 2023, the defendant pleaded guilty to the sole count in the above-captioned superseding information, charging her with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 371.

II.   The Sentencing Guidelines

   A.   Guidelines Calculation

As set forth in paragraphs 32–42 of the PSR, the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") calculation is as follows:

| | | |
|---|---|---:|
| | Base Offense Level (§§ 2X1.1(a); 2B1.1(a)(2)) | 6 |
| Plus: | Loss more than $25 million (§ 2B1.1(b)(1)(L)) | +22 |
| Plus: | Substantial part of scheme committed outside United States and sophisticated means (§ 2B1.1(b)(10)(B) and (C)) | +2 |
| Less: | Mitigating Role, Minor Participant (§ 3B1.2(b)) | -2 |
| Less: | Acceptance of Responsibility (§ 3E1.1(b)) | <u>-3</u> |
| Total: | | <u>25</u> |

In addition, pursuant to revised Guideline Section 4C1.1(a), effective November 1, 2023, the defendant is eligible for an additional two-level decrease to her offense level because has zero criminal history points. Accordingly, her adjusted offense level is 23 which, based on a Criminal History Category of I, carries a Guidelines sentencing range of 46 to 57 months' imprisonment.

III.   The Appropriate Sentence

Contrary to the defendant's assertions, a non-custodial sentence is insufficient to provide just punishment, to promote respect for the law and effect adequate deterrence. Rather, for the reasons set forth below, the government respectfully submits that a custodial term is appropriate and requests a Guidelines sentence.

   A.   Applicable Law

The Supreme Court has explained that the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is

5

reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). Title 18, United States Code, Section 3553(a) provides, in part, that in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
>
> (2) the need for the sentence imposed--
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct; [and]
>>
>> (C) to protect the public from further crimes of the defendant.

Section 3553 also recognizes the need to afford the defendant opportunities for rehabilitation. See 18 U.S.C. § 3553(a)(2)(D). Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence. The district court must also "remain cognizant of them throughout the sentencing process." Gall, 552 U.S. at 50 n.6.

    B.    Analysis

The defendant and the government agree that the applicable Guidelines range is 46 to 57 months' incarceration. ECF Dkt. No. 297, Defendant's Sentencing Memorandum ("Def. Mem.") at 26.

The government respectfully requests that the Court impose a term of imprisonment within the advisory Guidelines range because such a sentence is sufficient but not greater than necessary to achieve the goals of sentencing. See 18 U.S.C. § 3553(a). Specifically, the circumstances in this case, the history and characteristics of the defendant, the need to promote respect for the law and provide just punishment and the need for specific and general deterrence warrant a custodial sentence within the advisory Guidelines range.

    1.    The Nature and Circumstances of the Offense Warrant a Substantial Sentence

A Guidelines sentence is appropriate considering the serious nature and circumstances of the offense. The defendant and her co-conspirators engaged in a calculated, sophisticated, clandestine and brazen years-long scheme directed from Moscow and designed to prey upon the American private health care system. Through the scheme, Saidazim's co-conspirators caused the submission of over $500 million in reimbursements requests to be submitted to Private Insurers on behalf of over 50 Scheme Pharmacies. Third Superseding Indictment ¶ 25. As a result of those fraudulent submissions, the Private Insurers paid over $280 million. Id. Of that, the defendant had notice of at least $27,242,706.78 in losses. If the Private Insurers had been aware of the multiple fraudulent representations behind the reimbursement requests, they would not have been reimbursed. Acts of fraud, such as those committed by the

6

Defendants, "drive up the costs of health insurance for everyone," and make it "difficult for some New Yorkers to afford quality healthcare." Tsirelman v. Daines, 794 F.3d 310, 316 (2d Cir. 2015).

The offense is serious and supports a custodial sentence. The Defendants' scheme was calculated to prey upon inefficiencies in the health care system, specifically the Private Insurers' delay in identifying fraud at pre-existing brick-and-mortar pharmacies. It was sophisticated both in using call centers to identify beneficiaries across the United States and in using remote billing software and teams to submit hundreds of thousands of fraudulent reimbursement requests from Moscow. It was clandestine in using straw owners, shell companies, multiple phones, encrypted messaging platforms and aliases to conceal the Defendants' identities, ownership and control. It was brazen in scaling the fraud to over 50 Scheme Pharmacies in order to steal hundreds of millions of dollars. Moreover, while the scheme was calculated, sophisticated, clandestine and brazen, the defendant Dela Saidazim worked at its center for over two years – beginning in January 2019 and ending permanently only with her arrest in June 2021.

a. The Defendant's Minor Role And Lack of Profit-Sharing Do Not Warrant a Sentence of Time-Served.

Despite her role at the center of the scheme for over two years, the defendant argues, in sum and substance, that she is entitled to a non-custodial sentence because she was a low-level employee with limited authority, who acted at the direction of her boss and others, and who did not share in the profits. See Def. Mem. at 2 ("The 'nature and circumstances' of . . . Dela's limited participation in that conduct . . . however, favor, leniency."). See also id. at 4, 28-34. But both the government and Probation have already acknowledged that the defendant was a "minor participant" in the conduct, justifying a two-level decrease in the offense level. See PSR ¶¶24-25. The defendant concedes that the government and Probation applied this deduction *and* that "the government agreed to reduced charges to allow Ms. Saidazim to plead guilty" (Def. Mem. at 2), but still argues that her role and limited compensation justify an even more lenient sentence. The defendant's argument essentially asks for two bites of the apple—her "minor" role was already addressed by the Guidelines calculation. In fact, the Application Notes explain that the role adjustment addresses exactly the same contours as Saidazim's role and compensation—"a defendant in a health care fraud scheme, whose participation in the scheme was limited to serving as a nominee owner and who received little personal gain relative to the loss amount, may receive an adjustment under this guideline." U.S.S.G. § 3B1.2, Application Note 3(A). While Saidazim played a more significant role in the health care fraud scheme than a nominee straw owner, Probation and the government already support the application of a two-level reduction for her role as a "minor participant." Accordingly, the Court should not double-count the adjustment by diminishing her sentence even more due to her role or compensation.

b. The Defendant's Initial Lack of Knowledge and Intent Do Not Warrant a Sentence of Time-Served

The defendant argues that she "initially did not know the company was engaged in unlawful conduct" and therefore a more lenient sentence is appropriate. Def. Mem. at 4. See also id. at 2, 17, 28, 30. She cites United States v. Broderson for the proposition that a

7

defendant's lack of initial intent made him "significantly different from that of the typical fraud defendant." 67 F.3d 452, 459 (2d Cir. 1995). But Broderson's dicta concerning the defendant's initial intent was only one of multiple factors distinguishing his crime from a typical fraud case. Id. Specifically, the governmental victim in Broderson suffered no financial loss and the fraud was due to specific laws regulating government contracts and negotiations. Id.

Saidazim, however, should not receive leniency because, after leaving the scheme in July 2019 for three months, she returned knowing full well that she was rejoining a criminal conspiracy. See Def. Mem. at 14, 28. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The defendant makes no argument that she quit because of qualms about working for a criminal conspiracy. The government submits that, had she not been arrested when she traveled to New York, the defendant would have continued to work for the scheme indefinitely. Saidazim's full knowing involvement in the scheme from early 2019 through her arrest in 2021 therefore undercuts any argument for a downward departure due to her lack of initial intent.





        d.       The Guidelines and Loss Amount Do Not Overstate the Seriousness of the Offense

The defendant argues that her Guidelines sentencing range "vastly overstates the seriousness of her offense" because it "is driven almost entirely by the losses attributable to the improper conduct." Def. Mem. at 32. Nonetheless, she fails to recognize that the enhancement for loss amount is based on a narrow set of losses for which she had specific notice. See supra at 4, 6. Rather than holding Saidazim responsible for over $250 million in actual losses or over $550 million in attempted losses, the government seeks only to hold Saidazim responsible for approximately $27 million in losses for which she had notice. Accordingly, pursuant to U.S.S.G. 2B1.1(b)(1), the government and Probation are applying a 22-level enhancement as opposed to a 28 level or 30 level enhancement. In addition, the defendant concedes that the government allowed her to plead to a lesser charge with a maximum sentence of five year as opposed to the initially charged violations of 18 U.S.C. §§ 1347 and 1349, which allow maximum sentences of ten years. The plea agreement, loss amount and guidelines range therefore do not overstate the seriousness of the offense and are narrowly tailored to Saidazim's role and knowledge. Moreover, they are further mitigated by the downward departure for her mitigating role, as discussed supra at 7.

The defendant also mistakenly argues that a downward departure from the Guidelines is warranted because the losses are "substantial but diffuse" and the loss "substantially overstates the seriousness of the offense." Def. Mem. at 34 (citing U.S.S.G. § 2B1.1, application note 21(C)). Nonetheless, "substantial but diffuse" losses involve "relatively small amounts suffered by a relatively large number of victims," such as "a securities fraud involving a fraudulent statement made publicly to the market." U.S.S.G. § 2B1.1, application note 21(C)). The present case involves neither "relatively small" losses or a "relatively large number of victims." Even setting aside the full losses to all Private Insurers, the over $27 million in losses to six victims that Saidazim had notice of were both substantial and suffered by a small number of victims. See PSR ¶ 23. The Court should reject the defendant's characterization of the losses as diffuse or overstating the seriousness of the offense. The losses are severe and the Guidelines appropriately reflect the seriousness of the defendant's offense.

2. <u>The History and Characteristics of the Defendant Justify an Incarceratory Sentence.</u>

Contrary to the defendant's arguments, her history and characteristics do not justify a time-served sentence.



Even recognizing that "[i]f Dela were incarcerated, her contact with her mother would be drastically curtailed … if possible at all" (Def. Mem. at 36), many family members of defendants suffer similar absences as a result of the defendants' crimes. Saidazim's challenges in maintaining her emotional connections and communication with her mother are not unique and do not justify a non-custodial sentence.

The government acknowledges that felony convictions carry significant collateral consequences, While the Court should consider those consequences, in light of the egregious nature of the defendant's involvement in a serious international criminal conspiracy, the government respectfully submits that a term of incarceration remains warranted. The government submits that the Court can recognize Saidazim's relationship with her mother and her desire to care for her mother, but still impose a term of incarceration that appropriately addresses her criminal conduct.

3. <u>A Custodial Sentence Appropriately Reflects the Seriousness of the Offense, Promotes Respect for the Law and Provides Just Punishment</u>

Health care fraud, especially one on the scale and breadth here, is a serious offense that targets businesses and support systems relied on by millions of Americans. Congress aptly summarized the effects of health care fraud over forty-five years ago:

> Everyone pays the price for health care fraud: beneficiaries of Government health care insurance such as Medicare and Medicaid pay more for medical services and equipment; consumers of private health insurance pay higher premiums; and taxpayers pay more to cover health care expenditures.

10

H.R. Rep. 104-747 (1996). These concerns are just as pressing today as they were then, which is why Congress has enacted increasingly severe penalties for health care fraud, most recently directing the Sentencing Commission to add enhancements for defendants who commit the most financially serious health care frauds. See Patient Protection and Affordable Care Act, Pub. L. No. 111-148, §10606(a)(2)(C), 124 Stat. 119, 1007 (2010) (directing Sentencing Commission to amend guidelines in order to punish health care fraud more severely).

The defendant engaged in a calculated, sophisticated, clandestine and brazen multi-year conspiracy to submit fraudulent claims to Private Insurers for fraudulent prescriptions. She did so after learning the full extent of the scheme as the personal assistant to its leader, and after leaving and returning. A custodial sentence is required to reflect the seriousness of the defendant's conduct, to promote respect for the law and to adequately punish the defendant for her involvement.

    a.    <u>The Defendant's Time at MDC and on Home Detention Have Not Provided "Just Punishment"</u>

The defendant argues that "the particularly difficult nature of Dela's confinement in MDC and house arrest" have already provided "Just Punishment." Def. Mem. at 37-38. The defendant's argument is not well-taken. As an initial matter, while the conditions at MDC may have been harsh during COVID-19, Saidazim was only in custody at MDC for approximately two weeks. That short period of detention should not be substituted for 46-57 months of incarceration. Likewise, Dela's home detention from 2021 to the present does not mitigate the need for punishment. While her initial home detention may have been restrictive, the government submits it was similar in nature to millions of New Yorkers who sheltered in place during COVID-19 from 2021 to 2022. Even during that period of home detention, the defendant was allowed to leave for grocery shopping once per week, for hair, nail and grooming appointments once per month, to go to the bank upon request, to travel on holidays to the homes of friends, and to use her building's gym and rooftop patio at will. Upon her first request to the Court in September 2022, Saidazim was also allowed to work, leaving her home and traveling to work five days per week. Recently, Saidazim's home detention has been further reduced to a curfew, allowing her liberty within the district for most of the day. At no point has her home detention prevented family, friends or her boyfriend from visiting or residing with her. While home detention and curfew impose hardships and limitations on a defendant awaiting trial and sentencing, they are of a fundamentally superior caliber than a custodial term. The Court should not allow the defendant to substitute a relatively flexible home detention and curfew for the more stringent punishment of incarceration.

    b.    <u>The Defendant's Offense Is Materially Different Than Other Defendants That Received Non-Custodial Sentences</u>

The defendant incorrectly argues that she is similarly situated to other defendants who have received non-custodial sentences. Def. Mem. at 39-41. In actuality, the sentences cited by the defendant involved materially different circumstances, victim types, loss amounts and Guidelines ranges, among other factors:

11

- United States v. Onaga, 19-CR-61 (WFK) (E.D.N.Y.) (Kuntz, J.): The defendant in Onaga's conduct resulted in only approximately $60,000 in losses to state medical programs. Dkt. No. 89 at 2. Her Guidelines range was therefore 18-24 months of imprisonment, a fraction of Saidazim's Guidelines range. Accordingly, and as the defendant had taken steps to express remorse and accept responsibility for her actions, the government did not seek an incarceratory sentence. Id. at 4.

[REDACTED]

- United States v. Pangelinan, 16-CR-1409 (S.D.Cal.): While the defendant recruited doctors as did Saidazim, Saidazim's role was much more central and knowledgeable of the breadth of the scheme. Most significantly, the defendant in Pangelinan attempted to cooperate, speaking to the government. Dkt. No. 537 at 8. Nonetheless, due to the pandemic, the defendant was not signed to a cooperation agreement while the leader of the conspiracy, who recruited the defendant, did cooperate. Id. at 6, 8. Accordingly, while the defendant in Pangelinan was subject to a Guidelines range of 51-63 months' imprisonment, the government only sought a term of 15 months' custody. Id. at 3. Considering the totality of the circumstances, including that the defendant was less culpable than the "kingpin" of the scheme who had cooperated and already been sentenced, the court downwardly departed and sentenced the defendant to time served and an additional 10 months of home detention. By contrast, Saidazim has never spoken to the government or attempted to cooperate, and no other defendant has received any sentence justifying a relatively lower sentence for Saidazim.

- United States v. Wilensky, 15-CR-55 (WFK), 2022 WL 715550 (E.D.N.Y. Mar. 10, 2022) (Kuntz, J.): While the defendant's Guidelines range in Wilensky was also 46-57 months, Wilensky cooperated with the government. Def. Mem. at 41; Dkt. No. 83. Without detailing the particulars of that cooperation, which are set forth in the government's submission dated Feb. 18, 2021, it was substantial and the government requested "the most lenient sentence possible." Transcript of Sentencing dated March 9, 2022, at 10. Again, Saidazim has never provided any cooperation and therefore should not receive a time-served sentence consistent with cooperation.

The remainder of the cases cited by the defendant likewise materially differ in the defendant's role and knowledge, the losses to the victims, the nature of the victim, the Guidelines ranges and Probation and the government's sentencing recommendations.

### 4. A Custodial Sentence Affords Deterrence and Protects the Public

The Court's sentence should also further the aims of specific and general deterrence. 18 U.S.C. § 3553(a)(2)(B), (C).

Although this is the defendant's first criminal conviction, her conduct was not a momentary ethical lapse. As described above, the defendant's conduct occurred over years, including after being promoted to work for the leader of the conspiracy, being exposed to the breadth of scheme and—most significantly—returning after quitting for three months. After her release from home detention, nothing prevents the defendant from returning to Russia or rejoining the scheme.

A Guidelines sentence is necessary to deter not only the defendant, but also similarly-situated individuals from engaging in fraudulent behavior. Fraud schemes like the one perpetrated in this case threaten the integrity of the American health care system. Because the profits of these schemes are often enormous — the only limiting variables are the criminals' ability to manufacture claims and their likelihood of getting caught — it is critical to address the problem through systematic deterrence.

Moreover, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation marks and citation omitted). As Judge Garaufis has recognized, "[t]he need for general deterrence is particularly acute in the context of white-collar crime." United States v. Johnson, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018); see also; United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). This is true, in part, because "[p]ersons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed." See Johnson, 2018 WL 1997975 at *5 (internal quotation marks omitted); see also Harmelin v. Michigan, 501 U.S. 957, 988 (1991) ("[S]ince deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties"). This is especially true when the potential rewards for would-be criminals who are not caught can be substantial.

Even more than in the context of white-collar crime generally, the need to promote general deterrence is especially required where, as in the defendant's case, a health care insurer is the victim. Fraud against Private Insurers divert resources from the people those programs are designed to serve – the patients and beneficiaries – into the pockets of those who lie and cheat. They drive up costs for the public. In this case, they caused the destruction of dozens of existing brick-and-mortar pharmacies that serviced communities for years. The defendant's sentence should take into account the need to deter other people who may be tempted to commit similar crimes from enriching themselves at the expense of the public.

13

IV. <u>Forfeiture and Restitution</u>

While the government can neither confirm nor deny the extent of the defendant's compensation from the scheme, it is undisputed that the defendant received at least $88,00 in payment from the scheme. Those funds are subject to forfeiture. Accordingly, the government respectfully requests that the Court issue a final forfeiture order for $88,000 and incorporate the order into the judgment of conviction.

In addition, separate and apart from the forfeiture, which represents the defendant's divestiture of his ill-gotten gains, the defendant is obligated to repay restitution to the victims of her crimes. Under 18 U.S.C. § 3663A, the Court shall impose restitution. In <u>United States v. Zangari</u>, 677 F.3d 86, 93 (2d Cir. 2012), the Second Circuit held that restitution must be measured according to the victim's actual loss, not the defendant's gain. Moreover, in calculating restitution, "these losses need not be mathematically precise," and "[a] reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently incalculable." <u>United States v. Rivernider</u>, 828 F.3d 91, 115 (2d Cir. 2016) (internal quotation marks omitted). The government respectfully submits that the Court should order the defendant to pay $27,242,706.78 to the six Private Insurer victims as restitution for the conduct detailed in the Complaint and PSR. The government has no objection to that restitution obligation being joint and severally liable with any of the other convicted Defendants.

V. <u>Conclusion</u>

For the foregoing reasons, and based on a balancing of the Section 3553(a) factors, the Court should impose a sentence of imprisonment within the advisory Guidelines range of 46 to 57 months.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/
     Jonathan P. Lax
     Johnathan Vagelatos
     Jessica K. Weigel
     Assistant U.S. Attorneys
     (718) 254-7000

cc:   Clerk of the Court (WFK) (by ECF)
    Counsel of record (by ECF and E-mail)